FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

01 OCT 16 AM 8:21

U.S. DISTRICT COURT
N.D. OF ALABAMA

|                                  |   |
|----------------------------------|---|
| CHARLIE WALKER and LOIS TRUSS,   | ] |
|                                  | ] |
|              Plaintiffs,         | ] |
|                                  | ] |
|          vs.                     | ] |
|                                  | ] |
| SHELBY COUNTY, ET AL.            | ] |
|                                  | ] |
|              Defendants.         | ] |

CV-99-N-3240-S

**ENTERED**

OCT 16 2001

## MEMORANDUM OF OPINION

## I.    Introduction

The court has for consideration defendants' motion for summary judgment [Doc. 35].

The motion has been briefed and is ripe for decision. Upon due consideration, defendant's

motion will be granted.

## II.    Statement of Facts[1]

Both plaintiffs were employed by Shelby County at its juvenile detention facility.

(Truss Dep. at 28, 39; Walker Dep. at 33-34.)  The Shelby County juvenile detention facility

was located in the Shelby County Jail ("old facility") prior to 1998.  (Truss Dep. at 29.)  In

September 1998, Shelby County opened a new facility ("new facility").[2]  (Dudchock Dep.

---

[1]The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed or favorable to the non-movant. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2]Defendants note several differences between the old and new facilities. For example, the old facility only had four cells and a day room, was not operated by computer, and all of its doors had to be manually locked. (Truss Dep. at 29-31.) On the other hand, the new facility has thirty-two cells and is operated by computers that are housed in a control room. (*Id.* at 106-08.) Also, the locks at the new facility are controlled by computer rather than manually. (*Id.* at 107-08.)



at 13.)  Truss worked part-time at the old facility and served as a Youth Care Worker; Walker began his work for Shelby County at the new facility as a Lead Youth Care Worker.  (Truss Dep. at 28, 39; Walker Dep. at 32-34.)

Truss alleges causes of action under the ADA, Title VII and 42 U.S.C. § 1981. (Complaint at Introduction.)  Specifically, she alleges she was fired because of her disability and her race.  (Truss EEOC Charge.)  Additionally, she suffered as follows due to her race: she was not promoted; she was discriminated against in job assignments and pay; she experienced a hostile work environment; and she was retaliated against. (Complaint at ¶25.)  Walker alleges causes of action under Title VII and 42 U.S.C. § 1981. (Complaint at Introduction.)  Specifically, he alleges that because of his race, he was fired, discriminated against in job assignments and pay, retaliated against, and experienced a hostile work environment.  (Complaint at ¶13.)  Additionally, both parties allege the defendants undertook a pattern and practice of discrimination against black employees. (Complaint at ¶¶14, 26.)

### A.    Shelby County Policies Regarding Probationary Status

Both Truss and Walker received a copy of the Shelby County Policies and Procedures.  (Truss Dep. at 48; Walker Dep. at 35-36.)  In her deposition, Truss testified that she "observed the book.  I looked at it.  I looked through it."  (Truss Dep. at 48.)  Walker testified that he likewise read the policies and procedures.  (Walker Dep. at 36.)

Shelby County's "Policies and Procedures" manual defines a "Regular Employee" as an employee "who was appointed under the Provisions of this Act to a permanent position and who has completed his or her probationary period."  (Shelby County Policies

2

and Procedures at 12-4.) It defines a "Probationary Employee" as an employee "appointed to a permanent position in the classified service from a reemployment list and eligible register who has not completed his or her six (6) month probationary period. The traditional probationary employee with regular employee status shall serve a thirty (30) day probationary period." (Id. at 12-3.) It defines "Probationary Period" as "[a] period of six (6) continuous months of employment applicable to a permanent position in the classified service. The probationary period is recognized as the employed-at-will period, whereas the employee does not have appeal rights. The promotional probationary period for promoted regular status employees in the classified service shall be thirty (30) days without any interruptions in service." (Id. at 12-3.) It defines "Classified Service" as "[a] category of service that provides permanent status to an individual after satisfactorily completing a probationary period. A regular employee shall be terminated through the means of disciplinary actions or reduction in force." (Id. at 12-1.)

Section 5.2 of the manual entitled "Disciplinary Process" states in part:

> The appropriate appointing authority or supervisor shall discipline a regular employee through the following means of a written warning. At indication of unacceptable performance or violation of rules and practices that do not warrant formal disciplinary action, the employee shall be issued a written warning. A written warning shall serve as an opportunity to the employee to take corrective actions and resolve any actions, problems or matters. . . . A copy of all written warnings and disciplinary actions will be maintained in the employees [sic] personnel file.

(Id. at 5-1.) Section 7.7, entitled "Dismissal," states that "[a] regular employee in the classified service may be terminated from employment with Shelby County through the application of formal disciplinary actions." (Id. at 7-3.) Section 7.8, entitled "Probationary

3

Termination," states that "[c]lassified service employees serving a probationary period may be terminated from employment with Shelby County by their respective appointing authority with or without cause and without appeal to the board." (*Id.*)

### B.    Truss

Truss was hired in 1993 as a part-time weekend youth care worker at the old facility. (Truss Dep. at 39-43.)  She was employed on the third shift, which ran from 10:00 p.m. to 7:00 a.m. (*Id.* at 29.)  She was the only employee who worked on the third shift. (*Id.* at 33-34.)  Her duties included answering phone calls, monitoring the juvenile detainees in custody every fifteen minutes, and documenting all activity and phone calls. (*Id.* at 28.) Sometimes she cleaned the facility if needed. (*Id.* at 32.)  John Miller was Truss' supervisor at the old facility. (*Id.* at 34.)  Truss claims Miller informed her that once the new facility was built, she would be employed full-time and would go to the day shift. (*Id.* at 40, 43.)

Truss was required to submit an application for employment at the new facility even though she was a current Shelby County employee. (*Id.* at 45.)  Truss interviewed with Debra RouLaine ("RouLaine"), Detention Manager, for a full-time position at the new facility. (*Id.* at 45-46; RouLaine Aff. at ¶9.)  RouLaine supervised the Youth Care Workers and the Lead Youth Care Workers. (Dudcheck Dep. at 14.)  RouLaine told Truss in the interview that she was pleased with what she had heard about Truss' work performance at the old facility. (Truss Dep. at 46.)

After the interview, RouLaine called Truss to inform her that she would be hired full-time for the third shift because that was all the County had to offer. (*Id.* at 47.)  Truss accepted the position and attended orientation for the new facility in September 1998. (*Id.*

at 47-48.) Other third shift employees included Melvin Battle, Mary Scott, Carlton Butler, and Vicki Joiner. (*Id.* at 152-53.)

The Shelby County Policies and Procedures manual given to Truss and Walker during orientation does not contain a policy regarding racial discrimination and how to report said discrimination. (Shelby County Policies and Procedures.) Truss contends that no one employed with Shelby County told her how to report discrimination or harassment. (Truss Dep. at 48.) She further asserts that she did not understand that if she was a victim of harassment or discrimination, she should contact her supervisor. (*Id.* at 48-49.) She also contends that she was not aware that if she felt she could not report discrimination or harassment to her supervisor, she could contact Human Resources. (*Id.* at 49.)

### 1. Failure to Promote

At the time the new facility opened, Truss asked to be placed in the position of Lead Youth Care Worker. (*Id.* at 45, 96-97.) Five Lead Youth Care Worker positions were available. (RouLaine Aff. at ¶12.) Truss was not promoted to the position. (Truss Dep. at 125.) One of the persons hired for the position was the other plaintiff in this case, Walker, an African American. (*Id.* at 126.) Other individuals who were hired for the position include Vickie Joiner, a Caucasian female, Scott Gordon, a Caucasian male, and Heather Ewing, a Caucasian female. (*Id.* at 125-26; RouLaine Aff. at 13.)

5

## 2.   ADA Claim

At the orientation, Miller questioned Truss about why she was eating during orientation. (Truss Dep. at 56-57.) Truss informed Miller and RouLaine that she is diabetic.[3] (RouLaine Aff. at ¶19.)  Miller then ordered her to go see his personal physician to be evaluated. (Truss Dep. at 65.) The next day, Miller informed her that she did not have to go see a physician for an evaluation. (*Id.*)

## 3.   Discriminatory Termination of Employment

Truss' employment was terminated effective January 13, 1999. (Pla.'s (Truss) Ex. 14.) Defendants allege Truss' employment was terminated because she slept on duty, left the control room unattended, and did not properly conduct the Watchtour system.  (Def.'s (Truss) Ex. 10.)  Defendants also point out that they had to counsel Truss about her handwriting and that she locked herself out of the control room on one occasion. (*See* Def's (Truss) Ex. 2; Truss Dep. at 115-16.)  Defendants further allege that Truss was a probationary employee, impliedly arguing that defendants were not required to follow disciplinary procedures and that her employment could be terminated without cause. (*See* Def.'s (Truss) Initial Br. at 18; Shelby County Policies and Procedures at 7-3.)  Truss believes she was not a probationary employee and therefore defendants had to document her alleged misconduct and follow proper procedures in order to terminate her employment. (*See* Pla.'s (Truss) Ex. 4; Shelby County Policies and Procedures at 7-3, 12-1.) Truss alleges that on September 23, 1998, defendants classified her as a "regular"

_____

[3]Truss contends she informed Shelby County in 1993 that she suffered from diabetes. (Truss Dep. at 61-64.)

6

employee. (Pla.'s (Truss) Ex. 4.) Further, Truss denies any misconduct. (*See* Pla.'s (Truss) Br. at 27.)

## C. Walker's Discriminatory Termination of Employment Claim

Walker applied for the position of Lead Youth Care Worker with Shelby County on June 30, 1998. (Def.'s (Walker) Ex. 1.) Initially, he interviewed with RouLaine for the position and thereafter with both RouLaine and Miller. (Walker Dep. at 32-33.) RouLaine contacted Walker and informed him that he had been selected for the position. (*Id.* at 33-34.) RouLaine and Walker agreed that he would work on the second shift. (*Id.*) Other individuals who worked on the second shift included Paula Vining, Becky Lamons, and Tanorence Moorer. (Walker Dep. at 36.) Walker alleges that he was hired as a "regular" employee. (*See* Pla.'s (Walker) Ex. 4.) His job duties included shift supervision of youth care workers, supervision of juveniles in secure custody at the Shelby County Juvenile Detention Facility, and performing the duties of a Youth Care Worker. (Pla.'s (Walker) Ex. 5.)

On November 8, 1998, Blake Turner, a detainee, cursed at a staff member and the staff member put Blake in his room for "time out." (Walker Dep. at 55-56.) After Blake was sent to his room, he began kicking on the door to his room and yelling obscenities so loud he was heard in the "pod" area where the other detainees were. (*Id.* at 55.) The staff had been instructed not to allow the detainees to kick or hit on the doors to their rooms because it might effect the electronics. (*Id.* at 56-57.) Walker allowed one of the Youth Care Workers, Tanorence Moorer, to remove Blake from his room and the "pod" area and place him in isolation. (*Id.* at 57-58.) Blake stayed in isolation between fifteen and thirty minutes.

7

*(Id.)* After Blake calmed down in isolation, he was returned to the pod area with the rest of the detainees. *(Id.)*

At some point during the day, Blake made a comment to John Miller concerning plaintiff Walker. *(Id.* at 61-63.) Later that evening, Miller met with several detainees in the pod about Walker and the rules for detainees. *(Id.* at 37-38.) When Walker walked in on the meeting, Miller was discussing the rules in the handbook. *(Id.* at 47-48.) According to Walker, the detainees were upset because he was enforcing the rules. *(Id.* at 50-51.) In regard to the comment that Blake had made to Miller earlier in the day, Walker told Miller that Blake was lying and that "I couldn't believe Blake." *(Id.* at 63-64.) This confrontation occurred in front of the other detainees. *(Id.* at 64.)

Later that day, after the meeting, Blake ran up the steps on the way to the shower in his shower shoes. *(Id.* at 58-59.) The detainees are not allowed to run up steps for their safety. *(Id.)* After Walker told Blake to walk up the steps, Blake started cursing at Walker. *(Id.)* Walker radioed the control room and informed them that he was taking Blake to isolation. *(Id.* at 60.) Becky Lamons, who also worked the second shift, saw Walker take Blake to isolation. (Lamons Aff. at ¶14.) Lamons returned to the control room and asked Paula Vining, another second shift worker, if she had seen Walker take Blake. *(Id.* at ¶15.) Vining responded that she had, and Lamons replied that she was afraid Walker would hurt Blake. *(Id.)* Vining agreed with Lamons. *(Id.)* As soon as Walker was out of the intake area, Blake called Lamons in the control room and stated that Walker was threatening him.[4]

---

[4]Walker contends that he never said anything to Blake that was in any way threatening. (Walker Dep. at 61, 117.)

(*Id.* at ¶16.) When Lamons went to isolation to talk to Blake, she found him shaking and physically upset. (*Id.* at ¶17.) Because Lamons was concerned for Blake's safety, Vining and Lamons decided to telephone Miller and ask him to return to the facility. (*Id.* at ¶18.)

In investigating the events of the evening of November 8, 1998, Debra RouLaine spoke with the employees on duty, Blake Turner, some of the detainees at the facility, and John Miller. (RouLaine Aff. at ¶16.) The day after the incident with Blake Turner, Walker was advised to remain in the control room. (Walker Dep. at 68.) During the week of November 10 through 17, Miller and RouLaine met and discussed Walker. (RouLaine Aff. at ¶18.) They agreed that Walker created too much of a risk to staff and residents due to his inability to deal effectively with delinquent youth. (*Id.*) On November 18, 1998, Walker's employment was terminated. (Def.'s (Walker) Ex. 6.) He had never been issued a written warning or written reprimand prior to his termination. (Walker Dep. at 194.)

## D.     Misconduct of John Miller

When the "new facility" opened in September 1998, John Miller was the Chief Probation Officer and Director of Juvenile Court Services. (Dudchock Dep. at 14.) Judge Patty Smith appointed Miller to his position at Shelby County and he serves at her pleasure. (*Id.* at 15-16.) Miller participated in giving performance input concerning RouLaine and the program at the facility. (*Id.* at 14.) He had the authority to reprimand Youth Care Workers and Lead Youth Care Workers. (*Id.* at 21.) He also had the authority to terminate employees of the Youth Detention Center without the approval of the County Manager. (*Id.* at 22.)

9

Miller took detainees from the old facility home with him on a few occasions, though he never took an African-American detainee home with him. (*Id.* at 50-51, 57, 160-61.) This was disallowed and Miller was disciplined for it. (Pla.'s (Truss) Ex. 12.) He was suspended for two weeks without pay. (*Id.*) Miller returned to the Youth Detention facility after his April 27, 1999, reprimand with the same duties and responsibilities he previously had. (Dudchock Dep. at 82-83.) Additionally, an employee complained to Dudchock, Judge Smith, and members of the Shelby County Commission that Miller would watch the male detainees take showers; however, nothing about the complaint concerned Dudchock. (Dudchock Dep. at 33-36.)

## E. Pattern or Practice of Discrimination Against African Americans

RouLaine and Miller terminated the employment of Eddie Morgan ("Morgan"), an African-American employee, for inappropriate and unprofessional action toward female detainees effective March 19, 1999. (Pla.'s (Truss) Ex. 15.) Morgan allegedly drew a Valentine picture that one of the female detainees took from him and wanted to take home with her. (Pla.'s (Truss) Ex. 17.) Morgan drew the picture prior to Valentine's Day. (*Id.*) Shelby County contends that Eddie Morgan was a "probationary discharge." (Pla.'s (Truss) Ex. 16.) Plaintiffs contend that Morgan had been hired on September 23, 1998 as a "regular" employee. (Pla.'s (Truss) Ex. 18.)

The employment of Melvin Battle, an African-American, was terminated on June 30, 1999, for allegedly "refusing to participate in training on the proper procedures for

10

operating the buffer."[5]  In addition, in approximately August of 2000, Robin Harrell, an African-American employee, was told by RouLaine that she would be called if they needed her, but she was never scheduled to work again. (Pla.'s (Truss) Ex. 23.)  Harrell alleges she was discriminated against because she complained about a white employee and reported incidents of discrimination. (Id.)

## III.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party

___

[5]The court notes that although the plaintiffs make this assertion in their response to defendant's motion for summary judgment, the reason for Battle's termination are not clearly supported by plaintiffs' citation to the record.

11

support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

12

must prevail as a matter of law." *Id*. at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**IV. Discussion**

**A. Plaintiffs' 42 U.S.C. § 1981 Claim**

Plaintiffs have cited 42 U.S.C. § 1981 as one of the bases for their discrimination claims against defendants Shelby County and the Shelby County Regional Juvenile Detention Center. In their motion for summary judgment, defendants argue that 42 U.S.C.

13

§ 1983 provides the sole cause of action against state actors for violations of § 1981. The defendants rely on the Eleventh Circuit decision of *Butts v. County of Volusia*, 222 F.3d 891 (11th Cir. 2000).

In *Butts*, an individual filed a one-count complaint against Volusia County, Florida for race discrimination based on § 1981. *See Butts*, 222 F.3d at 892. The district court granted the county's motion for summary judgment, holding that, based on *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), § 1981 does not provide a cause of action against state actors. *Id.* On appeal, the plaintiff argued to the Eleventh Circuit that the Supreme Court's holding in *Jett* had been overturned by the Civil Rights Act of 1991. *Id.* Specifically, the plaintiff argued that a cause of action against state actors was created under § 1981 by the addition of section (c), which reads: "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." *Id.* at 894 (quoting 42 U.S.C. § 1981(c)). The court disagreed. *Id.* It noted that although § 1981(c) indicates "that the section creates a right that private or state actors may violate," it does not provide a remedy for the violation of that right. *Id.* It also pointed out that nothing in the legislative history of the Civil Rights Act of 1991 indicated a Congressional intent to overturn *Jett* or "creat[e] a cause of action against state actors outside of § 1983." *Id.* Affirming the lower court, the Eleventh Circuit held that "[t]he district court . . . correctly concluded Appellant could not proceed with his cause of action based solely on § 1981." *Id.* at 894-95.

In the present lawsuit, it is clear that Shelby County is an arm of the state. *See id.* at 894-95. Defendants also point to evidence indicating that the Shelby County Regional

14

Juvenile Detention Center is likewise a state actor. Particularly, the defendant notes that the facility is funded entirely by state and county monies, that Shelby County oversees its operations, and that the County Manager is ultimately responsible for the facility. (Dudchock Aff. at ¶¶5-6.) In response, the plaintiffs are entirely silent on this issue, failing to dispute that the detention center is a state actor and that their claims cannot properly be based upon § 1981. As such, the court finds that both Shelby County and the Shelby County Regional Detention Center are state actors and are not subject to suit under § 1981. Summary judgment will therefore be granted in favor of the defendants on plaintiffs' § 1981 claims.

## B.    Truss' Failure to Promote Claim[6]

Plaintiff Truss argues that the defendants discriminated against her by not promoting her to the position of Lead Youth Care Worker when she began work at the new facility. In order to succeed at summary judgment on a claim of disparate treatment, a plaintiff must show purposeful discrimination on the part of the defendant. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950 (5th Cir. 1981). Purposeful discrimination can be shown by either direct or circumstantial evidence. *See Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). Direct evidence is evidence that, "if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). Should a plaintiff produce direct evidence that discrimination motivated the employment decision complained of, the defendant must prove that the same

_____

[6]Defendants also allege this claim is not part of Truss' EEOC charge and therefore should not be included as part of this lawsuit. The court need not reach that allegation.

15

employment decision would have been made in the absence of the discriminatory motivation. *See id.* The Court points out, however, that "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996).

In the absence of direct evidence, a plaintiff must demonstrate the defendant's discriminatory intent by establishing a prima facie case of discrimination. *See Berman* at 701-02. "To establish a prima facie case of Title VII [race] discrimination in a promotional decision, a plaintiff must prove: (1) that she is a member of a protected minority; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). Once the plaintiff has shown a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for promoting another individual instead of the plaintiff. *See id.* Should the defendant articulate such a reason, "the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual." *Id.*

The Eleventh Circuit has held that "[i]n a failure to promote case, . . . a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the officer who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were *mistaken but that they were in fact motivated by race*." *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000) (emphasis added).

16

Moreover, courts "are not in the business of adjudging whether employment decisions are

prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus

motivates a challenged employment decision." *Damon v. Fleming Supermarkets, Inc.*, 196

F.3d 1354, 1361 (11th Cir. 1999). While evidence that the employer hired a less qualified

individual rather than the plaintiff may be probative, *see Lee*, 226 F.3d at 1253, the Eleventh

Circuit has pointed to the Fifth Circuit standard as the evidentiary burden borne by the

plaintiff in this regard:

> In *Deines* [*v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277
> (5th Cir. 1999)], for example, the Fifth Circuit affirmed the district court's
> instruction to the jury stating that: "disparities in qualifications are not enough
> in and of themselves to demonstrate discriminatory intent *unless those
> disparities are so apparent as virtually to jump off the page and slap you in
> the face*." 164 F.3d at 280. The court explained that the phrase "jump off the
> page and slap you in the face" "should be understood to mean that disparities
> in qualifications must be of such weight and significance that no reasonable
> person, in the exercise of impartial judgment, could have chosen the
> candidate selected over the plaintiff for the job in question. This evidentiary
> standard does not alter the plaintiff's evidentiary burden to prove the fact of
> intentional discrimination by a preponderance of the evidence. Instead, the
> standard only describes the character of this particular type of evidence that
> will be probative of that ultimate fact . . . ." *Id.* at 280-81.

*Alexander*, 207 F.3d at 1340.

Applying the law to the facts in the present case, it is clear that the defendants are

entitled to summary judgment on Truss' failure to promote claim. The court notes that Truss

has not submitted any direct evidence of discrimination; therefore, she is required to

establish a prima facie case. Although the court is not altogether convinced that the plaintiff

has met this prima facie case,[7] the plaintiff has clearly not shown the proffered, non-discriminatory reasons of the defendants in promoting others instead of Truss are a pretext for discrimination. In her affidavit, Debra RouLaine gave the following reasons for hiring four other individuals instead of Truss to serve as Lead Youth Care Workers: "For the position of Lead Youth Care Workers, I hired Charlie Walker, African-American male, Vicki Joiner, Caucasian female, Heather Ewing, Caucasian female, and Scott Gordon, Caucasian male. . . . I hired Vicki Joiner based upon her six year experience as a director of a kindergarten program for many years where she supervised teachers. Ms. Joiner also supervised workers while she served as a missionary. . . . I chose Scott Gordon because of his eleven years of experience with the United States Marine Corp. While in the Marine Corp, Mr. Gordon gained experience in recruiting, instructing and supervising. . . . I selected Heather Ewing due to her eighteen months of experience as a Juvenile Detention Officer. As a Juvenile Detention Officer, Ms. Ewing had experience with reports and working with detainees and the public. . . . I hired Charlie Walker because of his year of experience supervising a college student center and two years experience supervising night shift at Glenwood (Parklane). While at Glenwood, he was responsible for paperwork, cleaning and checking on residents." (RouLaine Aff. at ¶¶13-17.)

Truss relies solely on her six years of experience as a part-time, third shift worker at the old facility as evidence that she was more deserving of the position of Lead Youth

_____

[7]Although the plaintiff can demonstrate, at the very least, a question of fact as to three of the elements of her prima facie case because she is a member of a protected minority and can point to some evidence from which a reasonable jury could conclude that she was qualified for the promotion and was rejected despite these qualifications, the court is troubled by the fact that Truss is alleging discrimination in spite of the fact that one of the individuals who was hired as a Lead Youth Care Worker, Charlie Walker, is a member of her protected class in that he is African-American.

18

Care Worker than the above-listed individuals. Truss fails to demonstrate, however, that she has any experience with supervising others. Moreover, as defendants point out, the new facility is very different, in substantive ways, from the old facility,[8] limiting the relevance of Truss' experience at the old facility. Truss has failed to show that the disparity between her experience and the qualifications of the individuals selected "jumps off the page and slaps you in the face." In the absence of legitimate proof that the defendants acted discriminatorily in their employment decisions, this court will not sit as a "super personnel department" and dictate to the defendants who they must and mustn't hire or promote. *See Lee*, 226 F.3d at 1254. Truss' claim fails because she simply has not produced any evidence to rebut the defendants' legitimate, business decision regarding the Lead Youth Care Worker positions.

## C. Pattern or Practice of Discrimination

Both plaintiffs claim they were victims of defendant's pattern or practice of discrimination. Recently discussing these types of claims, the Eleventh Circuit has noted that

In [pattern and practice] suits, the plaintiffs must establish "'that [sex] discrimination was the company's standard operating procedure.'" [citation omitted] To meet this burden of proof, a plaintiff must "prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. It has to establish by a preponderance of the evidence that [ ] discrimination [is] the company's standard operating procedure--the regular rather than unusual practice."

*EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286-87 (11th Cir. 2000) (citations omitted).

In meeting this evidentiary burden, the court has noted that "proof of discriminatory motive

---

[8]*See supra*, footnote 1.

19

is critical." *Id.* at 287 *(quoting Lujan v. Franklin County Bd. of Educ.*, 766 F.2d 917, 929 (6th Cir. 1985)). The court has further pointed out that "[a] plaintiff may establish a pattern or practice claim 'through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally.'" *Id.* *(quoting Mozee v. American Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991)).

In support of their claim that the defendants had a pattern and practice of discriminating against individuals on the basis of their race, plaintiffs point out that the employment of three other African-Americans was also terminated. Evidently, the plaintiffs are trying to show that the defendants' "standard operating procedure" was to fire African-American employees due to their race. This evidence, however, does not meet the plaintiffs' burden. The court has been presented with no evidence whatsoever as to, *inter alia*, how many people are employed by the defendants, the racial composition of this employment pool, the hiring and firing patterns that have emerged over time, the racial composition of the applicant pool compared to the racial composition of the actual hires, or the amount of Caucasian individuals fired by the defendants over the same time. Without information such as this, the court is in no position whatsoever to address the claims of the plaintiffs. Moreover, the plaintiffs present no evidence that the defendants' decision to fire these individuals was based on an improper motive. The plaintiffs have presented the court with a few isolated incidents of alleged discrimination, and have not presented the court with the "big picture" in order to prove the defendants had a pattern and practice of discrimination. Therefore, the defendants' motion will be granted as to these claims.

20

## D.  Truss' ADA Claim

The Complaint addresses Truss' ADA claim as follows:

> The plaintiff further avers that she is a qualified individual with a disability pursuant to the Americans with Disability Act and was able to perform the essential functions of her job, with or without accommodations. The plaintiff avers that the defendant discriminated against her because of her disability or perceived disability.

(Complaint at ¶27.)  Plaintiff makes no allegation of harassment due to disability in the

Complaint, although plaintiff discusses the prima facie case for disability harassment in her

brief.  The plaintiff, at this late date, cannot allege a cause of action for disability

harassment.  Therefore, the Court will consider only a claim of discrimination due to

disability.

The Eleventh Circuit has described the ADA as follows:

> In 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(1) (West 1995).  To accomplish that purpose, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a).

*Harris v. H & W Contracting Co.*, 102 F.3d 516, 519 (11th Cir. 1996).  To make out a prima

facie case of discrimination under the ADA, a plaintiff must prove that: (1) she has a

disability; (2) she is a qualified individual; and (3) she was discriminated against because

of her disability. *Pritchard v. Southern Co. Serv.*, 92 F.3d 1130, 1132 (11th Cir. 1996).  A

plaintiff meets the first element of the prima facie case if she: (1) has "a physical or mental

impairment that substantially limits one or more of the major life activities of such

21

individual"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." *Id.* (*quoting* 42 U.S.C. §§ 12102(2)).

"[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 522 (1999). The Supreme Court has noted two ways in which employers may "regard" a plaintiff as disabled: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-90 (1999). The Supreme Court further stated that "[i]n both cases, it is necessary that a covered entity entertain misperceptions about the individual--it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.*

Truss argues that Miller, her supervisor, regarded her as having an impairment. As evidence of this contention, plaintiff points out that Miller asked her why she was eating during an orientation for the new facility, and plaintiff reminded Miller that she was diabetic and needed to eat frequently to control her disease. Miller ordered her to see his treating physician to evaluate her diabetes. Miller withdrew the order the next day. Plaintiff also claims she was accused of stealing cookies from the break room and harassed, however plaintiff points to no evidence to support this allegation. Further, plaintiff was accused of sleeping on the job and not being able to perform her duties on "watch tour."

"[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Murphy* at 523. In *Cash v. Smith*, 231 F.3d 1301 (11th Cir. 2000), the Eleventh Circuit discussed a claim of "regarded as" disability. In *Cash*, the plaintiff presented evidence that the defendant employer prohibited the plaintiff employee from driving a company vehicle once the employer was aware of plaintiff's medical problems. The court found Cash failed to present evidence that her employer considered her "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'" *Cash, 231 F.3d* at 1306.

In this case, plaintiff has not met her burden. Her only evidence that Miller regarded her as disabled includes the following: Miller was aware that she needed to eat frequently; Miller told her to see his physician, but withdrew that request the next day; and other employees lied about her sleeping on the job and completing her watch tour. Plaintiff presents no evidence that Miller regarded her as unable to complete a range of jobs due to her disability.

Further, even if the court assumed that the plaintiff met the first two elements of her prima facie case, Truss has not provided any evidence that establishes the third element of her prima facie case: that the defendant discriminated against her because of her disability. As to this third element, the Eleventh Circuit has stated:

The ADA requires that a plaintiff prove by a preponderance of the evidence that she was discriminated against "because of" her disability. 42 U.S.C. §§ 12112(a). We unambiguously have held that the ADA's "because of" causation language is defined as "a factor that *made a difference in the outcome.*" *McNely,* 99 F.3d at 1077 (emphasis added). In explaining this standard, we

23

explicitly rejected a reading of the ADA's "because of" language that would require plaintiffs to demonstrate that they were discriminated against *solely* because of their disability. *See id.* In so doing, we observed that the statute "merely imposes a *'but-for'* liability standard." *Id.* Therefore, we simply require that a disability be shown to be a determinative, rather than the sole, decision-making factor.

*Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999). Although the Court in *Farley* apparently defined a relaxed standard regarding discrimination, Truss' evidence does not even come close to proving that her diabetes played any role whatsoever in the defendants' decision to terminate her, let alone a "determinative, decision-making factor." *Cf. Harris v. H & W Contracting Co.*, 102 F.3d 516, 524 (11th Cir. 1996) (finding plaintiff met her burden when employer "allegedly explained that he decided to replace [plaintiff] as comptroller because he 'felt that the company was being put in jeopardy, at a disadvantage due to her type illness.'"). Because Truss lacks evidence that the defendants regarded her as disabled and that they discriminated against her because of her diabetes, her claim under the ADA fails.

## E.    Truss' and Walker's Hostile Work Environment, Retaliation, and Discriminatory Pay Claims[9]

In their Complaint, Truss and Walker allege a hostile work environment, retaliation, and discriminatory pay. Even though the defendants specifically argue that summary judgment should be granted as to these claims, the plaintiffs fail to respond to the defendants and do not urge any reason why this court should not grant summary judgment in favor of the defendants on these issues. Moreover, a thorough review of all of the parties'

---

[9]Defendant also alleges these claims are not part of plaintiffs' EEOC charges and therefore should not be included as part of this lawsuit. The court need not reach those allegations.

evidentiary submissions reveals little if any support for these claims. Therefore, the court will grant summary judgment as to these claims.

## F. Walker's Discriminatory Termination of Employment Claims

Plaintiff Walker argues that the defendants discriminated against him when they terminated his employment. This allegation is analyzed under the disparate treatment framework set out in the section discussing Truss' failure to promote claim. *See Crapp v. Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001). To repeat the standard set forth above, in order to succeed at summary judgment on a claim of disparate treatment, a plaintiff must show purposeful discrimination on the part of the defendant. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950 (5th Cir. 1981). Purposeful discrimination can be shown by either direct or circumstantial evidence. *See Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). Direct evidence is evidence that, "if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). Should a plaintiff produce direct evidence that discrimination motivated the employment decision complained of, the defendant must prove that the same employment decision would have been made in the absence of the discriminatory motivation. *See id.* The Court points out, however, that "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996).

In the absence of direct evidence, a plaintiff must demonstrate the defendant's discriminatory intent by establishing a prima facie case of discrimination. *See Berman* at

701-02. To establish a prima facie case of Title VII racial discrimination, the plaintiff must show that: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. *Crapp v. Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001). Once the plaintiff has shown a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for taking the adverse employment action against the plaintiff that it did. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). Should the defendant articulate such a reason, "the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual." *Id.* at 1565.

Walker has not presented any direct evidence of discrimination, thus he must establish a prima facie case in order to succeed on this claim. Defendants argue that Walker has not proven a prima facie case because he has not shown that his employer treated similarly situated, non-minority employees more favorably. Particularly, Walker argues that John Miller is a similarly situated employee whom the defendants treated more favorably than him. Initially, "the 'burden is on [the plaintiff] "to show a similarity between [his] conduct and that of white employees who were treated differently and not on the [defendant] to disprove their similarity."'" *Shuford v. Alabama State Board of Education*, 978 F. Supp. 1008, 1017 (M.D. Ala. 1997) (*quoting Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989)). The Eleventh Circuit has stated:

> To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. In determining whether employees are

26

> similarly situated for purposes of establishing a prima facie case, it is
> necessary to consider whether the employees are involved in or accused of
> the same or similar conduct and are disciplined in different ways. If a plaintiff
> fails to show the existence of a similarly situated employee, summary
> judgment is appropriate where no other evidence of discrimination is present.

*Holifield*, 115 F.3d at 1562 (citations omitted).  Further, "[i]n order to satisfy the similar

offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in

order 'to prevent courts from second-guessing employers' reasonable decisions and

confusing apples with oranges.'"  *Silvera v. Orange County School Board*, 244 F.3d 1253,

1259 (11th Cir. 2001) (*quoting Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

Finally, "[c]ourts have held that disciplinary measures undertaken by different supervisors

may not be comparable for purposes of Title VII analysis."  *Jones v. Gerwens*, 874 F.2d

1534, 1541 (11th Cir. 1989), *see also Jones v. Bessemer Carraway Medical Center*, 137 F.3d

1306, 1312 n.7 (11th Cir. 1998) ("[A]t the time of their incidents . . . they were under

supervisors different from Plaintiff's supervisor.  Such a difference may be sufficient to

prevent them from being considered 'similarly situated' with Plaintiff.")

     Turning to the facts of the present lawsuit, Walker's employment was terminated

because he told Miller a certain detainee was lying in front of the detainee and other

detainees. In addition, he allegedly provoked a detainee, and threatened and scared the

detainee which resulted in the detainee shaking and crying in fear.  Walker denies he was

provoking or threatening detainees.  As evidence of a comparator, Walker points to John

Miller, a white employee.  Miller cannot be considered a comparator, however, because

there are at least three significant differences between Walker's  and Miller's situation.

First, Miller was accused of taking detainees from the facility to his home on a few

occasions, in some cases without the proper documentation. Miller's misconduct was very different from the actions Walker allegedly engaged in that led to his termination. Further, Miller held his position at the will of a judge and was supervised by her; Walker was supervised by RouLaine. (Walker Dep. at 198.) Finally, Miller was a non-listed employee who has worked for Shelby County since June 1982. (Miller Dep. at 9.) As discussed below, Walker was a probationary employee who could be fired without formal documentation or reprimand and had only worked for Shelby County two months prior to his termination. Because of these differences, Miller cannot serve as a comparator for Walker, and Walker, therefore, cannot make out his prima facie case.

Even if Walker could establish a prima facie case, though, he cannot prove pretext. Defendants have put forward a legitimate non-discriminatory reason for the termination of Walker's employment: Walker allegedly accused a detainee of lying in front of others, provoked detainees, and created a hostile environment for detainees. Although Walker claims he did not do part of what defendants allege he did, "[t]he law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). The employer submitted evidence to the court sufficient to establish it believed the defendant committed such actions.

28

In regards to proving pretext,[10] plaintiff cites the lack of documentation in his file. Plaintiff believes that because he was a "regular" employee, and not a "probationary" employee as defendants claim, all of the alleged incidents should have been documented in his file. Defendants say Walker was a probationary employee and therefore there was no requirement that the alleged incidents be documented. Plaintiff's belief that he was a regular employee stems from a document entitled "Shelby County Commission Payroll/Personnel Information Record," on which his listed "employment status" is "regular (non-exempt)." (Pla.'s (Walker) Ex. 4.) The categories of "employment status" include salaried (exempt), elected (exempt), regular (non-exempt), judicial, and hourly (non-exempt). "Probationary" is not a choice for employment status because the employment status refers to whether or not Walker was exempt from overtime pay requirements. In addition, Walker also is listed as a "new hire" on that document. Further, he believed he had to undergo a probationary period:

Q: Mr. Walker, when you went through training, did you understand that you would be a probationary employee for the first six months?
A: Yes.

(Walker Dep. at 194.) The only other evidence of pretext that Walker points to is that he denies that he provoked or threatened the detainees. This alone is not enough to prove pretext. Therefore, Walker's claim fails.

---

[10]In his brief, Walker points to the discriminatory comments of his supervisor, Vicki Joiner. However, Joiner held the same position as Walker; Walker's supervisor was RouLaine. (Opponent Walker's Evid., Ex. 1 at 198.) It appears plaintiffs' counsel mistakenly used a portion of Truss' brief in Walker's brief.

29

## G. Truss' Discriminatory Termination of Employment claims

The analysis of this claim is the same as in the preceding section: Truss must prove a prima facie case of discriminatory termination, which includes, *inter alia*, a showing that the defendants treated similarly situated, non-minority employees more favorably than her. *See Crapp v. Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001). Defendants first allege that Truss is not qualified to do the job. Truss testified, however, that she did not do the things she was accused of doing. Therefore, her qualification for the job is in dispute. However, defendants also contend that Truss has not provided evidence of other similarly situated comparators. Truss points to John Miller as a comparator.

As with Walker, Miller is not similarly situated to Truss because of significant differences in their situations. First, Miller was accused of taking detainees from the facility to his home on a few occasions, in some cases without the proper documentation, while Truss was fired because she allegedly slept on duty, left the control room unattended, could not conduct her watch tour properly, and failed to follow the specific instruction of her supervisor. Moreover, Miller was the Director of Juvenile Services for Shelby County and was supervised by, and served at the pleasure of, Judge Smith; whether Truss was a probationary employee or a regular employee, she was a Youth Care Worker and her supervisor was Vicki Joiner, not Judge Smith. Because there are significant differences in the misconduct committed and Truss and Miller had different supervisors, they cannot be considered similarly situated. Therefore, Truss does not meet her prima facie case.

## V.    Conclusion

Defendants' motion will be granted as to all claims.  An appropriate judgment will

be entered with this memorandum of opinion.

Done, this    15th  of  October, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

31